Robinson *et al. vs.* The Bank of Darien, &c.

No. 12.—WM. ROBINSON *et al.* plaintiffs in error, *vs.* THE BANK OF DARIEN, defendant in error. THE STATE OF GEORGIA, plaintiff in error, *vs.* THE ADMINISTRATOR OF JAMES HOLFORD, deceased, defendant in error. WRIGHT, BULL & CO. plaintiffs in error, *vs.* THE STATE OF GEORGIA, defendant in error. THE STATE OF GEORGIA, plaintiff in error, *vs.* THE BANK OF MILLEDGEVILLE, defendant in error. THE STATE OF GEORGIA, plaintiff in error, *vs.* THE BANK OF HAMBURG, defendant in error. THE PLANTER'S BANK AND ANOTHER, plaintiffs in error, *vs.* THE STATE OF GEORGIA, defendant in error. THE STATE OF GEORGIA, plaintiff in error, *vs.* THE PLANTER'S BANK, defendant in error.

[1.] The Bank of Darien was incorporated with a capital stock of $1,000,000, divided into $10.000 shares of $100 each; 5.000 shares were subscribed for by the State, valued at $500.000, upon which 65 per cent. or $325.000 was paid in, prior to 1834. Upon the petition of the President and Directors of the bank, an Act was passed that year, to extend the charter to the 1st day of January, A. D. 1855, with this *proviso:* "Nor shall any thing be so construed as to authorize the President and Directors to call in an additional instalment upon the stock of the State:" *Held*, that notwithstanding the unpaid capital stock may be a trust fund, for the satisfaction of corporation debts, yet the right to call in the unpaid instalments on the State stock in the Darien Bank, was taken away by the Act of 1834.

[2.] An Act to extend the charter of a corporation, by usage, includes the terms or condition upon which said extension is granted.

[3.] An unconstitutional Act, although void as a law, may, nevertheless, operate as notice, not only to the corporation who accept of it, but to third persons, who act upon it.

[4.] The debts contracted with a bank must sometimes, of necessity, be paid in property or in stock of the bank itself, or of some other bank. In either case, it continues a part of the capital stock, to which the stockholders have no immediate claim; and is a fund to which the creditors of the bank must look for payment of their claims; and for the unpaid instalments upon such stock, the corporation, and not the stockholders, is responsible.

[5.] All reasonable and proper expenditures incurred by a receiver or other agent, in winding up the affairs of an insolvent bank, are legitimate charges

against the trust fund, and should be allowed, unless shown to be over-charged or wrongfully charged.

[6.] By the general law of the land, as well as by the 6th section of the Act of 1841, (*Cobb*, 139,) the notes and bonds payable at and discounted at any bank, may be paid in the bills of that bank; and that, too, notwithstanding said notes or bonds may be transferred to any other bank; and the right continues, even after the note or bond has been carried into judgment. The notes or bills of a bank, which form the common currency or circulating medium of the country, should be protected in preference to every other class of debts; and all Statutes passed for this purpose, should be liberally construed, to effectuate this policy.

[7.] The sovereign right of the State to priority of payment out of the effects of an insolvent, is based upon the Common Law, and was adopted by the Act of 1784, which introduces into the Jurisprudence of Georgia the whole body of the Common Law, not inconsistent with our new frame of government, and subject, of course, to legislative modification. It is a wholesome right; and as such, should receive the sanction and approbation of the Courts.

[8.] This right of priority is not inconsistent with the principles or spirit of our institutions; but is necessary for the protection of the public revenue, so as to enable the Government to accomplish the end of its institution.

[9.] It does not exist here with all the incidents to the royal prerogative right in *England*. We have not the writ of protection, nor the extent, in chief nor in aid; the priority of the State is a rule only in the distribution of the property of the debtor, requiring the debt due to the State to be first paid where the individual creditor has no antecedent lien over-reaching it.

[10.] A State, by becoming a stockholder in a private corporation, does divest itself of its sovereign right as a creditor.

[11.] The State, it is true, by becoming interested with others in a banking corporation, does not impart to that corporation any of her privileges or prerogatives, so far as it respects the transactions of the corporation; but the doctrine goes no further.

[12.] Although it is a favorite policy with a Court of Chancery to distribute the assets of an insolvent debtor, among all the creditors *pari passu;* yet, when a judicial preference has been established by the superior legal diligence of any creditor, that preference will be observed in the distribution of the assets.

[13.] Although the weight of authority may be, that in regard to *equitable assets,* the creditors, as between themselves, are all equal and are to share in proportion; yet, the rule is clearly different as to *legal assets;* as to these, the *execution creditors* are entitled to a preference.

[14.] The broad and most sensible distinction between legal and equitable

Robinson *et al. vs.* The Bank of Darien, &c.

assets is this : the former can be reached and made liable to the creditor by legal remedies; whereas, on the contrary, to obtain possession of the equitable interest of the debtor, the judgment creditor must go into Equity.

[15.] The State having redeemed more than one half of the outstanding circulation of the Darien Bank, no further liability attaches to her as a stockholder.

[16.] Bank notes, although fraudulently put into circulation, or even stolen, become the property of him who gives valuable consideration for them, having no knowledge of the fraud or robbery.

[17.] A party who proves the loss of a bank note, is entitled to require of the bank payment of the same, provided suitable indemnity be tendered.

On appeal, in Baldwin Superior Court.    Decision by Judge
-HARDEMAN.

The following were the facts agreed on in the several cases which were heard together :

The Planter's Bank of the State of Georgia recovered a judgment, in due form of law, in McIntosh Superior Court, December Term, 1840, for the sum of $28.395 00, with interest on $20.000, from the first day of April, 1839; interterest on $7.235, from the 23d day of March, 1839 ; interest on $160, from the 25th day of March, 1839, and interest on the residue, $1000, from the 8th day of December, 1840 and $71$\frac{25}{100}$ costs. Part of said judgment, viz: $7.395, was on bank bills of the Bank of Darien, duly demanded from the Bank of Darien, and protested for non-payment. The rest of the judgment was on bills of exchange and checks of the Bank of Darien, drawn on South Carolina and New York, and returned protested for non-payment. Execution duly issued on said judgment, and the execution was duly returned by the Sheriffs of the Counties of Chatham and McIntosh, respectively, *nulla bona.* Returns dated 10th November, 1847, and 25th November, 1847. The said protested bills of exchange or checks, so given by the Bank of Darien, were given in redemption of bank bills of the Bank of Darien, presented according to the custom of banks for payment by the Planter's Bank, to the Branch Bank of the Bank of Darien in Savannah.

The Bank of the State of Georgia recovered a judgment, at the same Court and Term of Court, against the Bank of Darien, for the sum of $12.764$\frac{93}{100}$, with interest, from the 22d day of July, 1839, and the further sum of $3.009$\frac{34}{100}$ with interest, from the 29th March, 1839, and $14 costs. This judgment was on bills of exchange or checks and on certificate of deposit. The bills of exchange or checks were given by the Bank of Darien, in redemption of bank bills of the Bank of Darien, presented according to the custom of banks in Savannah for payment by the Bank of the State of Georgia, and were returned protested for non-payment. Execution duly issued on this judgment, and the execution was duly returned by the Sheriff of McIntosh County, 26th November, 1846, and 27th June, 1853. The Bank of the State of Georgia collected and received from the Bank of Darien part of said judgment, leaving due thereon on the 8th September, 1839, the principal sum of $12.764$\frac{93}{100}$, with interest from 8th September, 1839, and costs.

The Bank of Darien chartered, in 1818, went into operation April, 1819, with a subscription of One Million of Dollars, of which the State subscribed for half, and individuals for half. The first "state of the bank" of the Bank of Darien, shows that the capital then paid in on account of subscriptions, was $228.500. The amount in specie then on hand, was $100.046$\frac{91}{100}$. The amount in bank notes, of the Bank of Savannah, was $123.592, and in notes of banks of Augusta, $256. Total specie and bank notes, $223.894$\frac{91}{100}$. Instalments on stock were called in from time to time, to the amount of sixty-five per centum; the remaining thirty-five per centum was never called in. The State of Georgia paid on its subscription $325.000, and individuals paid the same. In 1834, the charter of the Bank of Darien was amended, with certain provisions, and the creditors above named became such creditors in the year 1839.

On the 10th day of Dec. 1841, the Legislature of Georgia passed an Act to repeal the charter of the Bank of Darien, and to provide for a settlement of the affairs of the said bank.

On the 7th January, 1842, certain stockholders of the capital stock of the Bank of Darien, viz: Richard R. Cuyler, executor of P. Gibson and Robert Jackson, protested to his Excellency, the Governor of Georgia, against the said Act of 1845, and did refuse, by way of protest, to allow the provisions of said Act to be carried into effect. The Governor of the State received that protest, and on the 15th January, 1842, declined to respect it, as shown in his letter of that date.

The original individual subscribers to the stock of the Bank of Darien are shown in the written list attached to the plea of the defendants.

In March, 1842, the Central Bank of Georgia, by order of the Executive, took possession of the assets, books and papers of the Bank of Darien. It received the assests, books and papers of the principal Bank of Darien from the principal bank; it received the Macon branch assets and books from Mr. King, the cashier; the Dahlonega assets, and books from the cashier of that Branch; and the Central Bank then appointed John R. Anderson, an officer, to wind up the affairs of the Bank of Darien. Said Anderson gave a bond to do that duty, in the penalty of $10.000. Said Anderson had, for several years before, been and then was, cashier of the Branch of the Bank of Darien at Milledgeville. When the Central Bank so appointed him agent to wind up the affairs, it turned over to him everything, just as the Central Bank received it, appertaining to the principal bank, the Branch at Macon and Branch at Dahlonega, and left him in possession of the papers, books and assets of the Branch at Millegdeville, of which he was cashier.

Schedule A hereto annexed, shows what so went into Anderson's hands, except a large sum of old Milledgeville assets, which the said John R. Anderson had received as cashier, but had never entered into his books as cashier. Anderson became a defaulter, and was ordered, by the Executive, to make a return of his actings in relation to the assets of the Bank of Darien.

Schedule B, hereto annexed, shows what Anderson returned to the Central Bank in 1844.    Said Anderson collected from the said old Milledgeville assets considerable sums, and he paid in account thereof to the Central Bank $9.461, during the investigation of his acts as agent.

The collections which Anderson made, (beside and beyond the said $9.461,) were as follows:

| | |
|---|---:|
| In Certificates of Deposit and Checks on the Bank of Darien, | $21.421 16 |
| In current, good money, | 1.922 34 |
| In Darien Bank Notes, | 49.263 46 |
| | $72.606 96 |

He so collected that amount from the following items, viz:

| | | |
|---|---:|---:|
| Bank Balances, | $1.446 94 | |
| W. B. Wofford, | 7.738 39 | |
| Real Estate, | 6.227 94 | |
| Discount Line, | 52.368 22 | |
| Branch Macon, | 233 49 | |
| Interest, | 5.321 68 | |
| | $73.386 66 | |
| And he turned over to the Central Bank a partial payment at Dahlonega, | 779 70 | $72.606 96 |

After the said Anderson so made his return and accounted to the Central Bank for said sum of $72.606 96, the Cashier of the Central Bank was intrusted with the assets of the Bank of Darien, and all its books and papers.    He made the following collections from the assets:

| | |
|---|---:|
| In Darien Bank Notes, | [$115.939 00 |

| | | |
|---|---:|---:|
| In Certificates of Deposit and Checks of the Bank of Darien, | 3.722 | 48 |
| In current, good funds, | 33.876 | 05 |
| | **$153.537** | **53** |

Which, added to the collections of J. R. Anderson, as above, and turned over by him to the Central Bank, 72.606 96

Shows the sum of          $226.144 49
as the total collections by the Central Bank from the assets of the Bank of Darien, save and except certain lands in Mississippi, taken for debt.

The Central Bank paid out the said current funds, amounting to $33.876 57, as follows:

Paid sundry expenses,     $16.309 01
Paid John G. Winter, the oldest judgment creditor of the Bank of Darien, whose judgments were on bank bills of the Bank of Darien,          14.483 60
Paid to the Planter's and State Banks, on account of their judgments,
          $2.721 64
            362 32
                    3.083 96          $33.876 57

Of the other funds collected, (beyond the said current funds, $33.876 57,) by the Central Bank, no part has been paid to the creditors above mentioned. The Central Bank, by order of the Legislature, burnt and destroyed all the Darien Bank bills it had received, in any way, except $26.642, which amount it turned over to the Treasurer of the State, in whose hands it now remains.

The Darien Bank notes collected by Anderson, as above, were collected between March, 1842, and May, 1844.

The Darien Bank notes afterwards collected by the Cashier of the Central Bank, as above, were collected in the following years:

| 1844, | $15.000 | 1845, | $50.000 |
|-------|---------|-------|---------|
| 1846, | 15.000 | 1847, | 20.000 |
| | 1850, | | $15.939 |

In making collections from the assets of the Bank of Darien, the Central Bank received, in Darien Bank bills, from debtors of the Bank of Darien, after judgment obtained against them by the Bank of Darien, the sum of $42.620 22, which sum of $42.621 22 was part of the said $115.939, before stated, as collected by the Cashier of the Central Bank, and burnt.

The State sued Anderson's official bond, as agent, in Baldwin Superior Court, and recovered the penalty of $10.000. The Central Bank received the amount, and it is part of the said current funds collected by it, as above.

The bond of Anderson, as cashier of the Branch Bank at Milledgeville, was sued against him and his securities in Greene County. Judgment was recovered for $      .. Part of this judgment was paid in good money, and forms part of the aforesaid current funds collected by the Central Bank. The balance of this judgment, $12.723, was received by the Central Bank, under a resolution of the Legislature, in Darien Bank bills. The Central Bank also received $3.322$\frac{19}{100}$ rent of real estate, in Darien Bank bills.

The State has accounted to the Planter's and State Banks for the lands in Mississippi; and the amounts received by these Banks have been credited on their judgments.

The said payments from the land in Mississipi, and the amounts received by the said banks on said two judgments, were as follows:

Robinson *et al. vs.* The Bank of Darien, &c.

| | | |
|---|---|---|
| February 17th, 1854, | $2.728 03 | |
| August 17th, 1854, | 2.950 00 | |
| October 20, 1854, | 10.085 56 | $15.763 59 |

After applying all the credits hereinbefore set forth, the sum due on the said judgment of the Planter's Bank, being for principal, balance of interest and costs, is, on the 1st March, 1855,

| | |
|---|---|
| Principal, | $28.395 00 |
| Bal. of interest, | 23.015 78 |
| Costs, | 71 25 |
| | $51.482 03 |

and the sum due on the said judgment of the Bank of the State of Georgia, being for principal, balance of interest and costs, is, on 1st day of March, 1855,

| | |
|---|---|
| Principal, | $12.764 93 |
| Bal. of interest, | 9.962 96 |
| Costs, | 14 00 |
| | $22.741 89 |

The Bank bills, amounting to $7.395, sued to judgment as aforesaid by the Planter's Bank of the State of Georgia, were, after judgment, duly sealed up and delivered to the Central Bank, and entered on its books as received by it.

The Bank of Darien made a return of its condition and its stockholders, semi-annually, to the Governor, according to law. The last return made, October, 1841, showed that individuals held stock to the amount of $94.195, and that the State held stock to the amount of $325.000; and the balance of the capital stock paid in, $231.855, had been, before that time, redeemed and purchased by the Bank of Darien, chiefly taken by the Bank from debtors, in payment of their debts to the institution, part for a lot of land sold to the Marine &

Fire Insurance Bank of the State of Georgia, and part for what reason is not known. The printed return is to be read in evidence.

On the 25th December, 1843, by joint resolution of the General Assembly, a commissioner was appointed to investigate the affairs of the Bank of Darien. The commisioners reported in May, 1844, and that report is to be read by either party on the trial. The printed report of D. C. Campbell, director, under resolution of December, 1847, is to be read in evidence.

In 1844, Darien Bank bills were at a depreciation of 50 per cent.; and they have been at a like or lower rate ever since. Said bills have been at a depreciation ever since the end of the year 1841. The Central Bank passed the following resolution, which appears on its minutes:

TUESDAY, Nov. 29th, 1842.

Board met. Present, Tomlinson Fort, President, Wm. T. Hansel, Director:

*Ordered,* that John R. Anderson, the officer in charge of the assets of the Bank of Darien, instruct, by letter, the Attorneys or agents having charge of the collection of the debts due the Bank of Darien, that in all cases of judgment now existing or which may hereafter be obtained in favor of said Bank, that payment will be required in specie or its equivalent.

The certificates of deposit and checks on the Bank of Darien, as well as the Bank bills of the Bank of Darien, hereinbefore mentioned as collected by Mr. Anderson, and by the cashier of the Central Bank, were taken from debtors in settlement of the debts which they owed to the Bank of Darien, wherever the same were claimed as a set-off.

The debt due to John G. Winter on his said judgments against the Bank of Darien, was paid by the director of the Central Bank, under resolution of the General Assembly,

Robinson *et al. vs.* The Bank of Darien, &c.

passed in December, 1847. Payment was made, of principal, $9.002; interest before judgment, $83$\frac{14}{100}$; interest from the 24th August, 1840, to March, 1848, $5.398$\frac{46}{100}$. The judgments of J. G. Winter were founded on bank bills of the Bank of Darien.

In March, 1842, the State held of Darien Bank bills, $54.180, which bills were never redeemed, but were burnt by order of the Legislature. And the State was further a creditor of the Bank of Darien, in the sum of $25.897$\frac{96}{100}$, which amount has never been paid.

The various judgments against the Bank of Darien mentioned in Mr. Campbell's said report, were all dormant at the institution of these claims, except the judgments of the Plan-Bank—of the Bank of the State of Georgia—of the Mechanic's Bank, Augusta, and of the Bank of Milledgeville.

The assets so delivered, as aforesaid, by the Bank of Darien to the State, consisted (except real estate and rents thereof) entirely of promissory notes, bills of exchange and other choses in action, and judgments—being debts due the Bank of Darien—some running and some past due; and the amount hereinbefore set forth as collected, embraced items of interest as well as principal.

The Bank of Darien suspended specie payment before the passing of the Act of December, 1841, repealing the charter.

The judgment creditors, at the request of the Executive of the State and the Central Bank director, waived, without prejudice to their claims, their lien on the real estate, to enable the director of the Central Bank to sell it to better advantage, as they believed. The director of the Central Bank accordingly sold the real estate, and it brought the sum of $6.011$\frac{75}{100}$.

On the 16th day of February, 1842, the Bank of Darien transferred to the Central Bank of Georgia 3567 shares of the capital stock of the Bank of Darien. This is the stock which the Bank of Darien redeemed, as hereinbefore set forth. The capital stock was never reduced, by the Bank of Darien, on its books. Between April, 1819, and 17th No-

vember, 1828, there had been purchased by the bank 2565 shares, as shown by the first return of the bank to the Governor, and the remaining amount of stock was purchased up between then and the date of the Act of repeal. The State of Georgia has realized nothing on said redeemed stock.

All the remaining assets of the Bank of Darien are insolvent. Mr. Nisbet, the late Cashier of the Central Bank, swears that Mr. Campbell, the late director, endeavored to collect them, but could not succeed.

The Bank of Milledgeville, at the Term of September, 1844, of Baldwin Superior Court, recovered a judgment in due form of law, against the Bank of Darien, for the sum of $2210, with interest from the 1st day of April, 1842, and thirteen dollars and twelve cents costs. This recovery was on bank bills of the Bank of Darien duly demanded, and a clear schedule of the same is apparent on the record. Upon the rendition of the verdict, Mr. Day, one of the plaintiff's Attorneys, (by order of Court, as Mr. Day swears, to the best of his recollection,) marked on the face of the bank bills, "in judgment," sealed them up in an envelope and deposited them in the Clerk's office with the Clerk. Mr. Day swears, that the bank bills have never been, to his knowledge, withdrawn from the Clerk's office; that he has seen the package of bank bills in the Clerk's office since judgment was rendered; that William Steele, the then Clerk, asked Mr. Day what should be done with the package, and that Mr. Day told him they were a part of the record in the case. Mr. William Steele, late Clerk of Baldwin Superior Court, left the papers and package of bank notes in the office when he ceased to be Clerk. The package of bank notes, on search, cannot be found in the Clerk's office.

And the Bank of Milledgeville, at the September Term of Baldwin Superior Court, 1843, recovered a judgment against the Bank of Darien, for $852$\frac{45}{100}$, with interest from 25th September, 1839, and thirteen dollars and twelve cents costs. This recovery was for the collection of a note made by the Bank of Darien on account of the Bank of Milledgeville.

Service of process in each of the suits brought by the Bank of Milledgeville, was perfected on the head of the Central Bank, under the law of 10th December, 1841.    Executions duly issued on the respective judgments.    No part of these judgments has been paid.

The decisions of Judge HARDEMAN will be understood from the decision of the Supreme Court.

I. L. HARRIS, A. H. COOPER, JAS. GARDNER, Jr. JOHN E. WARD and F. H. CONE, were heard in behalf of the creditors.

R. H. CLARK, for the State.

The following opinions were delivered by the Court:

LUMPKIN, J.

Sundry individuals and corporations, creditors of the Bank of Darien, insisting that the State of Georgia was liable to them for the whole amount of their demands, or some considerable portion thereof, the Legislature of 1853–'4 passed an Act providing for the liquidation and settlement of these claims.    Commissioners were appointed, in the first instance, to hear and determine upon their validity, the Governor, as the representative of the State, and the creditors, having the right, respectively, to appeal from the award of the commissioners to the Superior Court, and from the decision of that Court to the final judgment of this Court.    And the State, disrobing herself of her sovereignty, gracefully and magnanimously pledged her faith to pay to the claimants whatever sums they should be found legally and justly entitled to.

The following is a correct statement, in substance, of the facts agreed on between the Counsel representing the State and the creditors, respectively, and collected from the public archives.

The Bank of Darien was incorporated on the 15th of December, 1818, with a capital stock of $1.000.000, divided in-

to shares of one hundred dollars each, and of which 5.000 shares were reserved, to be taken by the State. And on the day following, a joint resolution was passed by the General Assembly, authorizing the Governor to subscribe for the 5.000 reserved for the State. (*Journal of the Legislature of* 1818, *p*. 92.)

In 1819, an Act was passed providing for the payment of instalments then due and thereafter to become due, on stock in the Bank of Darien, and vesting certain funds in the stock of said bank. It required the Governor to vest $100.000 in said stock, a fund which had been set apart for the establishment and support of free schools, and $100.000, which had been appropriated for the improvement of the internal navigation of the State. Besides this, the further sum of $175.000 was appropriated to be drawn for from time to time, as future instalments should be required. (*Lamar's Digest*, 102.)

In 1828, the Central Bank was incorporated, and the shares owned by the State in the Bank of Darien, together with other stocks and funds, were vested in the President and Directors of said bank, and their successors in office. The whole constituting the capital of said bank, and subject to the payment of all bills and notes issued by said bank. (*Prince,* 72.)

[1.] In 1834, an Act was passed to extend the charter of the Bank of Darien, and the Acts then of force amendatory thereto. This extension, as the preamble recites, was granted upon the petition of the President and Directors of the bank. By the first section of this Act the charter and all the Acts of the General Assembly amendatory thereto, are prolonged to the 1st day of January, A. D. 1855, "*Provided,* that nothing in the *charter* shall be so construed as to prevent the State from selling out her stock, and thereby withdrawing her interest at pleasure; in which case, the stockholders should have the privilege of choosing five more directors. Nor shall any thing be so construed as to authorize the Pres-

ident and Directors to call in an additional instalment upon the stock owned by the State." (*Prince*, 71.)

It is important, as will be seen in the course of this investigation, to note carefully the foregoing provisions of this, especially the last clause quoted.

By the 16th section of the Act incorporating the Bank of Darien, it is declared, that "nothing contained in said Act shall be so construed as to take the power of controlling said institution out of the Legislature; but the Legislature shall, at all times, have the power of arresting or suspending said charter whenever it shall be made appear that the said corporation has not complied with all or any of its provisions." (*Prince*, 70.)

Accordingly, in 1841, an Act was passed repealing the original Act of incorporation, as well as the Act of 1834, extending the charter; and to provide for the settlement of the affairs of the Bank. (*Cobb*, 138.)

By this Act, the Central Bank was authorized and required to wind up the affairs of the Darien Bank; collect the assets and pay the debts thereof; and the balance, if any, to pay to those who might be entitled thereto. The number of directors were reduced to five, four of whom were to be elected by the Legislature and one by the stockholders. The board of directors, on the part of the State, were instructed to aid and facilitate the intents of said Act, by turning over, immediately, to the Central Bank, the whole of the assets of the Darien Bank. On all payments to be made on notes originally due the Darien Bank or its branches, and which should be turned over or renewed in the Central Bank, (and the privilege of renewal was allowed by the Act,) the maker or indorser of said notes was authorized to pay up the whole or any part of their notes in bills on the Bank of Darien, issued from the bank or branch bank, in which the said note or notes were originally discounted; and the Central Bank was held bound to take such bills when so tendered. The Bank of Darien was required to execute a deed of conveyance of all its real estate to the Central Bank, and the directors of the Central Bank to

sell the same on such terms and at such times, either at private sale or public outcry, as, in their opinion, should best promote the interest of the stockholders. The liability of the Central Bank was limited to the amount of assets received from the Darien Bank, after deducting all losses which might be sustained by the Central Bank, in cost or otherwise, in settling the affairs of the Bank of Darien. By the 10th section, it is enacted, that " if the directors or stockholders of the Bank, or any of them, should refuse to allow the provisions of the said Act to be carried into effect, the Governor was instructed to have such legal proceedings commenced as might be necessary to protect the interest of the State and all others concerned; and if necessary, to have application made to the Court of Chancery for the appointment of a receiver of the effects of said bank." (*Cobb*, 138–'9.)

Such is a full and fair analysis of the Act of 1841.

On the 7th of January, 1842, R. R. Cuyler, as qualified executor of Patrick Gibson, owner of 68 shares of Darien Bank stock, and R. B. Jackson, owner of 50 shares, and R. R. Cuyler, Joseph W. Jackson and M. H. McAlister, Esquires, as Attorneys of judgment creditors and other creditors of the Bank of Darien, formally protested against this Act; and filed said protest with his Excellency, Charles J. McDonald, then Governor of the State. The protestants declared that said measure was not taken, because they considered it desirable to continue the business of the Bank, but with a distinct view of placing the assets of the institution under the control of the Court of Chancery. They reminded the Governor of his power, under the law, to apply to the Court of Chancery, to take control of the assets of the bank, and announced their determination to refuse to allow the provisions of the Act of 1841 to be carried into effect; and to ask the interposition of the Judge of the Eastern Circuit.

In the report of the committee on banks made to the Legislature in 1847, in relation to the assets of the Darien Bank, it is stated, that other stockholders of the Darien Bank, on the 30th day of December, 1841, protested against the Act

of 1841.   This other and earlier protest has not been brought before this Court in the argument of these cases.

No resistance, however, was ever made to the execution of the Act, by application to the Judge of the Eastern Circuit for any injunctive proceeding or any other redress against the Central Bank, which, by the 16th section of its charter, is made as " capable of being sued in all Courts of record or any other place whatsoever," as any other corporation.   On the contrary, the judgment creditors have ratified this Act, not-withstanding their protest and menaced resistance ; not only by acquiescing in it for fourteen years and receiving partial pay-ments on their demands though the agency which the Act created, to wit: the Central Bank, but by becoming volunta-ry parties to this litigation.   It is not competent, we appre-hend, for these creditors to take and claim under this Act, and yet, refuse to abide by its provisions.   Their appearance here to-day, is a virtual withdrawal of their protest.

We should not have deemed it necessary to refer to these documents, not even for the purpose of completing the history of the transaction and of the times, notwithstanding they are introduced into the discussion, but for a single purpose, the bearing of which will more fully appear in the sequel of this case.

Governor McDonald replied to the protestants on the 15th of January, 1842, (other letters of his to the protesting stock-holders, bearing dates 1st, 6th and 12th of the same month, are referred to by the committee on banks but have not been brought before the Court in this discussion.)   He declined to apply to a Court of Chancery for the appointment of a receiver, placing his refusal upon the ground, that the creditors and stockhol-ders of the Bank of Darien would be " seriously injured by pressing its debtors at a time of great pecuniary embarrass-ment, as would be the case, if the assets were placed in the hands of a receiver."   That " the losses occasioned by urging the speedy collection of the debts by a receiver, would be im-measurably greater than by any future probable mismanage-

ment by the directors." And insisting, that "if the persons actually in interest were to be the victims of an indiscreet policy, the present board of directors had as well be the executioners as any one else." And premising, that "if the effects of the Bank were transferred to the Central Bank, under the Act of 1841, the rights of judgment creditors should be respected; and that as the debts were collected, the proceeds would be applied, doubtless, as the law directs;" meaning, of course, to the judgment creditors.

Thus early, then, and before the Act of 1841 had been carried into effect, we find a distinct recognition, by the Governor, as the representative of the State, of the lien of the existing judgments against the Bank of Darien, accompanied by a solemn pledge, that this lien should be protected. That principle and policy have never been abandoned or repudiated. On the contrary, they have been kept and observed down to the present period. In 1847, the Legislature, by a joint resolution, directed the Central Bank to pay over to the judgment creditors of the Bank of Darien, according to the priority of the same, the sum of $7.252 30, the net balance, after deducting expenses for winding up the same, and deliver to them, in the same manner, the good assets yet remaining, on account of their said judgments. (*Pamphlet Acts of* 1847, *p.* 307.) And as late as February, 1854, it was *resolved*, that the Treasurer of the State do pay over to the Planter's Bank of the State of Georgia and the Bank of the State, the oldest outstanding judgment creditors against the Bank of Darien, or their Attorney, on account of their judgments, rateably to be divided, the proceeds of the sales of land in Mississipi belonging to the Darien Bank assets. (*Pamphlet Acts,* 592.)

We respectfully submit, that the State of Georgia cannot be justly accused of "punic faith", at least, toward the *judgment* creditors of the Bank of Darien. From the correspondence of Governor McDonald, in 1842, down to the action of the last General Assembly in 1854, they have been the objects of the States' constant care and solicitude.

Having thus presented, in chronological order, the legislation of the State, applicable to the questions to be considered, we propose to advert, as briefly as possible, to the prominent facts involved in this investigation.

In March, 1842, the Central Bank, by order of the Executive, took possession of the assets, books and papers of the Bank of Darien, and appointed John R. Anderson to wind up the affairs of the Bank. Anderson had been, for several years before, and then was, cashier of the Branch of the Bank of Darien at Milledgeville. Anderson gave bond for the performance of his duty, in the sum of $10.000. He became a defaulter in 1844, and re-delivered to the Central Bank the assets of the Darien Bank, together with the sum of $72.606 96, collected by him.

The cashier of the Central Bank was then intrusted with the agency of liquidating and settling the affairs of the Darien Bank. He collected $153.537 53, which, added to the $72.606 96, received by Anderson, made the total collections by the Central Bank from the assets of the Bank of Darien, "save and except certain lands in Mississippi," $226.144 49. Those lands were sold in 1854, by a special agent appointed by the State, and brought the sum of $15.482 03, which, added to the $226.144 49, previously realized, makes the grand total of $241.626 52.

The expenses of winding up the affairs of the bank was $16.309 01. There was paid to John G. Winter, the oldest judgment creditor of the Bank of Darien, and whose judgment was founded on bank bills, $14.483 60 (including interest). There was applied to the two next oldest judgments, at the instance of the State and Planter's Banks, in all, $19.179 18, and there were received, in Darien Bank bills, from the debtors of the bank, who claimed the same as set-offs, $165.246. These items added together, make the sum of $215.217 79, which, deducted from the whole amount received, to-wit: $241.626 52, leaves a balance of $26.408 73 unaccounted for.

In making collections from the assets of the Bank of Da-

rien, the Central Bank received, in Darien Bank bills, from the debtors of the Bank of Darien, after judgments obtained against them by the Bank of Darien, the sum of $42.641 22.

The bond of John R. Anderson, as cashier of the Branch Bank at Milledgeville, having been sued and a judgment obtained thereon, a portion of it, to-wit: $12.723, was allowed to be paid, under a resolution of the Legislature, in Darien Bank bills.

The last semi-annual return made by the Bank of Darien, was in October, 1841, from which it appeared that 65 per cent. had been paid in on the capital stock; that is, $325.000, on the 5.000 shares owned by the State; and the like sum, or a fraction over, on the 5.000 shares held by individuals; and that 3567 shares had been purchased before that time by, and transferred to, the Bank of Darien; which amount of stock had been taken chiefly by the bank from its debtors, in payment of their indebtedness to the institution, part for a lot of land sold to the Marine and Fire Insurance Bank of the State of Georgia; and the residue, upon what consideration is not known. Of this stock it is admitted that 2.565 shares were purchased between April, 1819, and November, 1828, and that the remaining shares, making up the 3.567 were transferred to the bank before the Act of repeal was passed in 1841. It further appears, that the capital stock was never reduced or changed on the books of the bank, and that nothing has been realized on this transferred stock.

Bills of the Darien Bank have been at a depreciation ever since 1841. In 1844, they were at 50 per cent. discount, and have never been worth more, or at a higher rate, since.

In March, 1842, the State held of Darien Bank bills, taken mostly into the Treasury, in payment of taxes and other public dues, $54.180, which bills were never redeemed by the bank, but burnt by order of the Legislature. And the State was further a creditor of the Bank of Darien, in the sum of $25.897 96, which amount has never been paid.

*The assets delivered by the Bank of Darien to the State,*

*consisted (except the real estate and rents thereof) entirely of debts due the Bank of Darien.*

It seems, that by virtue of a certain contract entered into between one J. Delafield, as President of the New York Banking Company, and E. S. Reese, former Cashier of the Bank of Darien, a large amount of the bills of the Bank of Darien were put into circulation; and that a portion of these bills came into the hands of James Holford in his lifetime, in the due course of trade and without notice of any fraud in the transaction between Delafield and Reese. And one of the questions made upon this record is, is the innocent bill-holder entitled to recover against the bank upon these bills?

The Bank of Milledgeville, at the Sept'r Term, 1844, of Baldwin Superior Court, recovered a judgment against the Bank of Darien, on bills of the bank. The bills were fully set out and identified in the declaration. Upon the rendition of judgment, Mr. Day, one of the plaintiff's Attorneys, by order of the Court, marked on the face of the bills, "in judgment," sealed them up in an envelope and deposited them in the Clerk's office with the Clerk, Mr. Steele. Mr. Day and the Clerk both state that these bills have never, within their knowledge, been withdrawn from their place of deposit. The Clerk states that he has seen them in the office since the judgment was rendered. The Attorney instructed the Clerk that the packet was a part of the record of the case. It cannot, upon search, be found. Is the bank bound to pay these bills? And if so, upon what terms?

The foregoing is believed to be a correct compend of all the material facts which have been agreed upon by Counsel as the basis of the argument submitted and decision to be made in the premises, with this addition: that the whole amount of the outstanding circulation is $47.342. And that all the claims against the bank originated subsequent to the Act of 1834.

There are three grounds upon which all the creditors of the Darien Bank seek to charge the State with the payment of their demands:

1st. Upon the unpaid stock of $175.000. The State subscribed for 5.000 shares, valued at $500.000, of which $325.-000, only, was paid in. The creditors insist that this unpaid stock of $175.000 is a trust fund, out of which they are entitled to be paid.

2dly. They contend, that admitting the State had the right to reduce or restrict her liability upon her original stock, by the Act of 1834, extending the charter of the Darien Bank, and that said Act is a valid law for that purpose; that still, its provisions do not apply to the 3.567 shares transferred to the bank, and that the State is liable for its proportion of the unpaid stock upon these shares; and

3dly. The creditors maintain that the State is responsible, as trustee, for the waste, mismanagement and misapplication of the assets of the Darien Bank, which were turned over to the Central Bank to wind up the affairs of the Darien Bank, under the Act of 1841.

We propose, first, to examine each of these grounds in their order; and afterwards, the minor or collateral points involved in these cases.

[1.] As to the proposition, that the capital stock of incorporated companies is deemed a trust fund for the payment of the debts of the corporation, for myself, and I believe I may say, for a majority of this Court, at least, no doubt is entertained. This doctrine was affirmed by this Court in *Hightower vs. Thornton et al.* (8 *Ga. R.* 493,) and has been recognized and enforced in many leading cases since that time. In a late case in Pennsylvania, *The Bank of Virginia vs. Adams,* (1 *Parson's Select Equity Cases,* 534,) argued by Messrs. Dallas, Randall and other distinguished Counsel, the Court recognized, fully, the jurisdiction of a Court of Equity to compel stockholders to pay the just creditors of the corporation in proportion to the amount of stock subscribed by them respectively, and remaining unpaid. They say that such a jurisdiction is essentially conservative of the rights of the public, which gives credit to the corporation on the faith

of their ostensible capital, and to which such capital is pledged; and that any doctrine short of this would leave the general public subject to be prayed upon by reckless speculators, who will always be found ready to enter into any enterprize in which the prospect of profit seems great, and the certainties of hazard little.

This whole doctrine underwent a thorough examination in the late case of *Curran vs. The State of Arkansas*, (15 *Howard's R.* 304,) and cited in *Curtis's Commentaries, Supplement to 1st Volume, p.* 547; and the decision of this Court in *Hightower vs. Thornton*, (8 *Ga. R.* 491,) is reviewed and fully affirmed, namely: that the capital stock of an incorporated bank is deemed a trust fund for all the debts of a corporation; that it may be followed into the hands of every person save a *bona fide* creditor or purchaser.

This is not the difficulty, then, that the creditors have to contend with. It grows out of that clause of the Act of 1834 to extend the charter, which declares, that nothing therein shall be so construed "as to authorize the President and Directors to call in an additional instalment upon the stock owned by the State." As to *executory* contracts existing at the time this Act was passed, it might be well doubted whether it was competent for the Legislature to release the State from its liability upon its unpaid stock as to such creditors, unless the power to rescind the charter, reserved in the Act of incorporation, confers the right. But the constitutionality of the Act of 1834 cannot be called in question, on the ground that it impairs the obligation of contract. It is agreed that none of these claims existed when this Act was passed.

The first position assumed is, that the Act should be strictly construed, inasmuch as the State, as a sovereign, is legislating for the State as a corporator. And that conceding the President and Directors may not call in an additional instalment for the purposes of banking, that the creditors may nevertheless resort to a Court of Equity to enforce the payment of this stock for the satisfaction of their debts. To me, it ap-

pears plain, that this concession is fatal to the creditors. While the charters of our banks make the capital stock a trust fund for the payment of debts, it can only be reached through the directors, unless the directors neglect or refuse to call in such unpaid capital, or the charter is repealed or otherwise dissolved, so that no board is left for this purpose. No such exigency is alleged here. It is admitted, that by the Act of 1834, the directors were deprived of the power to make any further call. How can it be pretended, then, with any propriety, that credit was given to this fund by the public as the means of re-payment after that time? And yet, this con-stitutes the foundation for this doctrine. The reasoning is, that the stockholders are relieved from individual responsibility, and the capital stock is substituted in its stead; and its payment by the stockholders studiously provided for and diligently required. Hence, the people look to the capital stock as pledged to the payment of their debts. But how can the unpaid instalments of a corporation be trusted for a payment of debts, when the charter has been so modified as to relieve the stockholder from any further liability on his subscription? Would it not be fraudulent in the corporation to obtain credit upon a fund which it has consented never to collect? And do not those participate in the fund who contract with the corporation, upon the faith of such a fund? No creditor will assert that he ever dealt with the Bank of Darien upon the expectation that this $175.000 would be contributed for the relief of the creditors.

[2.] We cannot be brought into any doubt upon this point. The charter of this bank provides, that it shall have a capital stock of one million of dollars. The State subscribes for one half of the stock or 5.000 shares. By a subsequent Act of the Assembly, $200.000 are specifically directed to be vested in the bank, and $175.000 contingently. The bank receives $325.000 of this money from the State, and proceeds to transact business for the profit of all the stockholders. Upon this fund, then, as well as the unpaid instalments, if credit had been given, a contract would have been implied between the

State and such creditor, not only that the money paid in should not be withdrawn, but that still due should not be withheld, to the injury of the creditor.    But we repeat—no such facts exist here.    These parties do not, because they cannot, complain that they have parted with their property on the faith of the fund which they are now seeking to subject.    Instead of an assurance deducible from the charter, that this unpaid stock should be forthcoming when called for, for the purpose of paying the liabilities of the bank, they are notified, by a counter declaration of the most explicit character, in the Act of extension, that it never shall be required for any such purpose.    Ought the State, in the face of this Statutory warning, to appropriate $175.000 to discharge debts created five years afterwards?    We think not.

[3.]  But secondly, it is said that the Act of 1834 is unconstitutional and void, because the body of the Act contains matter different from the title.    It purports to be an Act to extend the charter of the Bank of Darien and the Acts now of force amendatory thereto.    By it a Branch at Dahlonega, Lumpkin County, was established, and the State claimed to elect seven directors, and gave to the private stockholders three only, instead of each choosing five according to the original charter.    And by it, the president and directors were prohibited from calling in any additional instalments on the stock owned by the State.

The application for extension proceeded from the Bank, as the preamble recites, and was granted upon terms.    Is it necessary that the title should indicate the terms?    Or are not these implied in every such Act?    Many instances of this sort might be cited from the Digests.    In February, 1850, an Act was passed "to extend, for five years, the charter of the Central Bank of Georgia."    (*Cobb,* 144.)    Now the argument is, that under such an Act, any matter different from the original charter, or outside of it, is void.    And yet, that Act declares, that the extension of the charter of the said Central Bank of Georgia is granted solely with the view of enabling

it to close its unsettled business, and is not to be construed as conferring upon it any rights or privileges, except to accomplish that end. Here is extension, it is true, but with what a sweeping condition or qualification!

When a corporation is chartered simply, we look beyond its title to the body of the Act, to ascertain its terms. By custom, the same seems to be true of Acts of extension. The title of the Bank of Darien, itself, is merely " an Act to incorporate the Bank of Darien." (*Prince*, 67.) By the 13th section, stockholders are made individually liable. This is not a necessary element of a bank charter. By the old law, and even by the law as it now stands, individual stockholders are not liable for the debts of the Bank, in their private capacities, unless expressly made so. The Darien Bank was incorporated upwards of thirty years ago. And this was among the earliest, if not the very first charter in which this new feature was introduced. Cannot as strong reasons be assigned against the constitutionality of this individual liability clause, under which these creditors claim, as can be alleged against the clause which is objected to in the Act of 1834? Believing, as I do, that the provision in the 17th section of the 1st article of our State Constitution is one of the best in it, to protect the country against sinister and selfish legislation, I should be unwilling to relax the rules of construction heretofore applied to this clause; and if this Act stood alone, for its binding efficacy, upon this ground, we might feel more embarrassment. But when we recollect that the conditional extension of the charter was applied for and accepted by the corporation itself, as is evidenced by the establishment of the Branch at Dahlonega, and other facts, the parties, themselves, would be estopped, and it would seem to suffice, at least as notice to third persons. An action of trover may be dismissed, because illegally brought; still, it answers the purposes of a demand, so as to sustain a second suit. The publication of this Statute in the *Pamphlet Acts of the Session of* 1834, and its re-publication in *Prince's Digest* in 1837, two years before the credit was given, as one of the

laws of the State then of force, was enough, in all conscience, to put the community upon its guard against trusting to this fund.

[4.] The next ground taken to charge the State with the payment of these debts, is, that before the 16th of February, 1842, the State became the owner of 3.567 additional shares of the capital stock of the Bank of Darien, upon which there had been a payment of sixty-five dollars per share. It is assumed that the balance due upon this stock, constitutes a fund for the payment of the creditors of the bank. And that if the State is not liable to pay the whole amount due upon stock, it is certainly liable for one half, as the stock belonged to the Bank of Darien, and the State owned one half of the stock of that bank. And further, that it was not in the power of the President and Directors of the Bank of Darien, or of the Legislature, to discharge the holders of this stock from the payment of the balance due upon it, if the same is necessary for the payment of the creditors of the bank—such a law would impair the obligation of the contract between the bank and its creditors.

An inaccuracy of statement, as to a matter of fact, is the cause of the fallacy in this branch of the argument. Counsel set out by the assumption, that the *State* became the owner of the 3.567 shares transferred to the bank by its debtors; or at least, one half of it; whereas, in truth, the *State* never owned a single share of this transferred stock. It was transferred to the *Bank of Darien*, and never distributed among the stockholders of that corporation. In the semi-annual report, submitted by James Troup and Eben S. Reese as President and Cashier of the bank, in 1834, in conformity to the legislative requisition, in the list of stockholders, showing the number of shares owned by each, the *bank* is returned as holding this transferred stock. (See *Journals of the Senate of 1834, p.* 138.) And so it is in all the subsequent reports.

Whatever liability attached, therefore, to this stock, was a question exclusively between the Bank of Darien and its creditors, and not between them and the stockholders. Had

the bank continued to do business, it might have sold out this stock, or it might as is sometimes done, have divided it among its stockholders. But the bank having failed, nothing was ever realized upon this stock; and it remains, to this day, the property of the *bank*, and subject, like all the rest of its assets, to the payment of its debts.

We feel it to be a work of supererogation to adduce authority to a point that is familiar to every man who has ever occupied the place of director in any bank or business corporation. Said Judge *Davies,* in *Hartridge et al. vs. Rockwell et al. (R. M. Charlton's R.* 260,) "In general, the capital stock of a bank is employed in making loans upon personal or other security, and the interest or discount upon such loans forms the profits of the bank, to which each stockholder is entitled, in proportion to the number of shares owned by him. The debts contracted with the bank must sometimes, from necessity, be paid in property *or in stock of the bank itself,* or some other stock. In either case, it constitutes a part of the capital stock, to which the stockholders have no immediate claim, so long as the institution exists ; but is the fund to which the creditors of the bank must look for payment of their claims."

The question is put triumphantly by one of the learned Counsel, suppose dividends had been made upon this stock, would not the State have got her share of the profits? We answer, unhesitatingly, yes—in the same way that she participated in all the profits made by the *bank,* in which she was a stockholder. Shall the State share in the gains and not in the loss? We say again, yes—as a stockholder, the State is entitled to receive her portion of all that is made, subject to such liability for losses as the charter imposes, and none other. It would be an unpardonable trespass to elaborate so plain and familiar a principle. Suppose there had been no individual liability clause in the charter of the Darien Bank, and the stockholders had paid up the full amount of their subscriptions, and the corporation had become bankrupt, with a large outstanding circulation unredeemed, and

other indebtedness unprovided for—could the State have been called on to pay a dollar?   And yet, if large profits had been realized, would she not have partaken of them?   The State, as a stockholder, has been confounded with the Bank of Darien as a corporation.   We repeat, that it is to the latter and not the former, that the creditors must look for whatever responsibility, if any, is annexed to this transferred stock.   If it has been sold and conveyed according to law, the original subscribers are released, and the *Bank of Darien*, alone, is liable.   We do not decide this point.   All we say is, that the *State*, as a *stockholder*, is not liable, whoever else may or may not be.

[5.] But it is said, in the *third* place, that the Act of 1841 is in the nature of a legal assignment; and that the Central Bank and its officers being the agents of the State, have mismanaged and misapplied the funds of the Bank of Darien, according to the provisions of the Act creating the trust; and that consequently, the State is liable to the creditors, to make good said waste or malversation, to the extent of the injury sustained.

Grant, for the sake of the argument, that the Act of 1841 operates as an assignment, and that the acts of the Central Bank are the acts of the State, what are the breaches of trust specified?

1st. The $16.309 01 expenses incurred in winding up the affairs of the Darien Bank.   The Act makes provision for this: "All losses in cost or otherwise, in settling the affairs of the Darien Bank" are first to be deducted out of the assets.   (*Cobb*, 139.)   And is this not reasonable and right? And is the amount too large for collecting and paying out $241.626 52?   Not an item of this sum has been singled out and assailed as excessive or wrongful.   Why have not the creditors overcharged and falsified?   If there is a wrong charge or an overcharge, beyond what is just, why did they not show it?   We take the account stated to be correct, and the *onus probandi* is upon the creditors to show the contrary.

[6.] 2dly. It is complained, that under a resolution of the

Legislature, $12.723, the balance of the judgment recovered against John R. Anderson and his securities, as Cashier of the Branch Bank at Milledgeville, was received by the Central Bank in Darien Bank bills, when it should have been collected in current funds.

The resolution under which this money was paid, was not read on the argument.   It is not published in the Digest or any of the Pamphlet Acts.   And notwithstanding we devoted several days to the consideration of these claims, at the heel of the term we were unable to find this resolution.   Counsel for the State and the creditors having left the Court, we were unfortunately deprived of their aid in ferreting out this and various other matters, which, in our estimation, became important to a correct and satisfactory conclusion in the cases.

Under these circumstances, we held that the same presumptions were to be made in favor of the Acts of the Legislature as of the judgments of Courts.   They stand upon the same footing, in this respect.   And that the resolution under which these depreciated bills were received, stood for a reason to support it.   Other considerations impressed themselves upon our minds, for sustaining this transaction, to which we will advert hereafter.

After the most laborious search in the Journal of the Senate of 1849–'50, under the head, in the index, of "Reports of Committee" "on Banks," at page 253, I succeeded in finding the resolution.   It seems that the securities of Anderson petitioned the Legislature for its consent to pay the residue of the $18.000 judgment recovered against them, on account of the official delinquency of their principal, in bills of the Bank of Darien, or the value of such bills at their depreciation.   And the committee, " in view of the liability of the State (as a stockholder in said bank, and by reason of its bad management of its assets since the State took the control of them) while they declined recommending that the petitioners be allowed to pay the residue of the judgment in the depreciated value of the notes of the bank, concurred, nevertheless, in the justice of the alternative prayer of the petitioners,

and advised the adoption of the following resolution, which was agreed to, to-wit: the Director and Cashier of the Central Bank be authorized to receive from Wm. D. Anderson, Thos. Anderson and Rich. J. Willis, in payment of the residue of the judgment in favor of the Bank of Darien against John R. Anderson and the petitioners, bills of the Bank of Darien, *or any other claim or claims against said bank, founded on bills, at their par value,* provided the same be valid and just.

I shall be pardoned, I trust, for suggesting that sympathy for suffering securities was indulged by the Legislature in this case, at the expense of public justice. The privilege is given to discharge this debt by any counter claim against the Bank of Darien, founded on bills, such as certificates of deposit, and for which the State was clearly not liable under the XIIIth section of the charter, which restricts her liability, as a stockholder, to the ultimate redemption of " the bills or notes issued by the bank." Moreover, the committee and the Legislature were mistaken in supposing, that under this individual liability clause, the State was relieving herself of an existing obligation, by permitting this balance of $12.723 to be paid in Darien Bank bills. True, she was bound to redeem one half of the outstanding circulation. But that she had done at least *seven* years before that time. It is admitted, that as far back as 1842, she had received into the Treasury $54.180 of Darien bills. And by reference to the report of the committee on finance, at page 210 of the *Journal of the House of Representatives,* of 1847, it will be found that the amount thus redeemed by her stated to be $54.170, in that document, remained still on hand and is unpaid to this day ; whereas, the outstanding circulation is only $47.342. So that when this resolution was recommended and adopted in December, 1849, so far from a duty's resting on the State, " in view of her liability as a stockholder," to receive in payment these depreciated bills, she had redeemed, at that time, $3.419 more than her share.

[7.] Shall the State, then, by reason of this piece of *legislative* " bad management," the only one which has been made

out by the proof, be held to account to the creditors for this fund? If the transaction stood by itself, we should find it difficult to defend her. But against this, we propose to set off the $25.897 96 owing by the Darien Bank to the State, and to which she is entitled to be first paid out, of the assets of the bank.

[8.] This priority or prerogative right of preference in the payment of debts, constituted a branch of the Common Law of England; and as such, was adopted in this State by the Act of 1784.

[9.] It does not exist here with all the incidents to the royal prerogative right in England. We have not the writ of protection nor the extent, in chief or in aid. Here the priority of the State is a rule only in the distribution of the property of the debtor, requiring the debt due the State to be first paid, where the individual creditor has no antecedent lien over-reaching it.

This privilege does not embarrass the debtor. He may alien or encumber his estate, or use it in any way which his convenience or interest may dictate. It merely regulates the rights of creditors; placing the State upon higher ground than private creditors. And as the Government is established for the good of the whole, and can only be supported by means of its revenue, ought not this revenue to be protected for the benefit of the whole?

But it may be said, that there are judgment liens here which cannot be displaced by this prerogative right belonging to the State. The judgments had no liens upon the debt recovered of Anderson for a breach of his bond. It may have been legal assets, because it could be reached by legal process; still, there was no legal lien upon it. No vested right would be disturbed by awarding the preference to this public debt.

[10.] It is argued that the State, by becoming interested with others in a banking corporation, has laid aside its sovereignty and is entitled to no privileges or preference not derived from the charter. For myself, I cannot subscribe to

the proposition.  I am unable to understand how it is, that because the State takes stock, more or less, in a bank, she thereby divests herself of all the privileges which attach to her as a sovereign—as a creditor of the corporation.

[11.]  As a stockholder, it is true, none of these immunities belong to her; but as a State, she occupies a very different position.  And it will be found, that neither the case of *Curran vs. The State of Arkansas*, nor any of the authorities, hold that a State is disfranchised of any of her prerogative rights as a sovereign, by taking stock in a private corporation.  They only go to the extent of affirming that the State, by so doing, does not impart to the corporation any of its privileges, so far as it respects the transactions of the corporation.  A very different doctrine, and one with which we have no controversy.

The demand of the State, founded, in principle, as to its priority, upon *Magna Charta* itself, (*Schley's Digest*, 41,) " which was written by the property holders of the Kingdom, and signed by a conquered King, not for his private benefit, but for the public good," being double the sum alleged to have been illegally compromised by the State, the creditors cannot complain if the one be allowed to set off the other, as well as to cover other instances of bad management, not spe cifically enumerated or proven; more especially, as it is still an adjourned question, whether the whole amount of this re covery or some considerable portion thereof, will not have to be refunded.  The securities of Mr. Anderson who paid this money, petitioned the Legislature of 1851–'2, suggesting that a large amount of the judgment was illegally obtained, and praying that the same might be refunded.  And the commit tee to whom the subject was referred, after stating that they found some difficulty as to the precise sum which ought to be returned, *but that there was justice in the claim*, recommend ed the appointment of some suitable individual, by the Gov ernor, to investigate the matter and report to the General Assembly next ensuing, what amount, if any, had been un-

justly recovered. And accordingly, a joint resolution to that effect was adopted. (*Pamphlet Acts*, 1851–'2, *p.* 571–'2.) What has been done since, if any thing, does not appear. We have learned, outside the record, that the investigation resulted unfavorably to the applicants. But it is not usual for a claim, with a legislative sanction like this, to be abandoned.

I would further remark, upon this head, that when the Government is plaintiff, it has been doubted whether any set-off will be allowed, unless authorized by special Statute; and for the same reason, that priority of payment of public debts is given, because it is necessary to enable the State to accomplish the end of its institution. (4 *Dall.* 303. 9 *Cranch.* 213, *Ib.* 313. 9 *Peters*, 319.) But the converse of this is not true, because the reason upon which the doctrine is founded does not operate.

The next and only remaining instance of mismanagement complained of is, that the State, through the Central Bank, received in Darien Bank bills, upon debts due the Darien Bank, $165.202 46, when the whole of this sum, or at least the $42.621 22 which was in judgment at the time of the assignment, should have been collected in current funds.

It is worthy of notice, at least, that throughout the whole Legislative proceedings in reference to the Darien Bank, the amount collected by the Central Bank in Darien Bank notes, is stated to be $191.904 31, instead of $165.202 46, as agreed upon by Counsel. (*See Journals of the Senate*, 1847, *and every where.*) Of the Darien bills burnt by the State, she was permitted to retain $26.000, which are still deposited in her Treasury. This sum, added to the $165.000, would make the $191.000. Was not this $26.000 collected out of the State assets, instead of those of the Darien Bank? And has she not, in fact, redeemed $80.000 instead of $50.000 of the currency of the Darien Bank?

While this discrepancy does not affect any principle involved in this decision, we deemed it of sufficient importance not to be overlooked.

By the 6th section of the repealing Act of 1841, (*Cobb*, 139,) it is provided, that "in all payments to be made on notes originally due the Darien Bank or its branches, and which shall be turned over to or renewed in the Central Bank, the maker or indorser of such note or notes shall be authorized to pay up all or any part of his or their note or notes, in bills on the Bank of Darien, issued from the bank or branch bank in which the said note or notes were originally discounted, and the Central Bank shall be bound to take such bills when so tendered."

And this was but a re-enactment of the 15th section of the Act of 1832, "more effectually to secure the solvency of all the banking institutions in this State." (*Cobb*, 100.) That "the notes and bonds hereafter made payable at and discounted by any bank, shall, when transferred to any other bank, continue payable in the bills of the bank at which they were so made payable and discounted, in the same manner and on the same principles as if they were still holden by the bank at which they were made payable, and by which they were discounted: *Provided*, that nothing therein contained shall be construed to take away from any bank any rights which are secured to it by the provisions of its charter."

The principle embodied in this law was justly considered, by the Legislature, as having a tendency to secure the solvency of our banking institutions.   The Act, itself, was overlooked in the discussion ; and as it will be perceived, relieves the Legislature, entirely, from the charge of having arbitrarily, by the 6th section of the Act of 1841, authorized the debtors of the Darien Bank to pay their notes in the bills of that bank.   Instead of conferring the right by this Act, it was not in the power of the State to take it away, without impairing the obligation of contract.   For the general law of 1832 being in force when these debts were created, the mode of payment, as prescribed by that Act, entered into and formed a part of the contract.   Indeed, it is doubtful whether, upon general principles, and independently of the Act of 1832 and the 6th section of the Act of 1841, the debtors of the Darien

Bank did not possess the right of discharging their debts with the notes of the bank to which they were payable.   The principle is a salutary one, and has been wisely incorporated into our system, and should be beneficially construed, as one of the many means resorted to by the State to protect the community from reckless and improvident banking.   And the spirit of the law certainly, if not the letter, applies to debts already in judgment, as well as to those which were sued or still running.   The only inquiry is, are these debts founded upon notes or bonds, payable at and discounted by the Bank of Darien?   If so, they are, and of right should be, payable in the bills of the Darien Bank, whether in judgment or not. We believe that there is not a Statute in the Digest, having relation to monetary matters and banking, which provides so effectually for the protection and pecuniary prosperity of the people of this State.

But it is said, and the same idea is to be found in some of the reports submitted to the Legislature, all of which I have examined with the utmost care, so far as it was in my power to procure them, that by this collection in Darien Bank notes the State has been released from its liability as a stockholder, while the creditors have been deprived of the benefit of these assets, to which they had a right to look for payment.   But are not the bill holders creditors?   Should any other class be preferred to them?   And do not these bills constitute debts against the Darien Bank that issued them ; and to put which in circulation these very notes were discounted, which make up the sum total of these *assets?*   Is the State, as a stockholder, primarily and originally liable for the redemption of these bills?   Did she, as a State or a stockholder, flood the country with this spurious currency?   I address myself to professional men, who understand the law of corporations *as it is.*

By the Act of 1836, amending the charter of the Monroe Rail Road Company, and conferring upon that corporation banking powers and privileges, (*Prince,* 369,) the road to be built, together with all the revenue arising therefrom, and all

the property, equipments and effects therewith connected, were pledged and bound for the redemption of the bills. And in addition to this, the persons and property of the stockholders were made individually liable for the same purpose. Under this Act, this Court did not hesitate to hold, that the bill holders had a prior lien, over-riding all other claims or contracts; and that too, notwithstanding the individual liability clause. *Collins vs. The Central Bank et al.* (1 *Kelly*, 435.) There as here, it was insisted they had two funds to look to, namely: the road and the stockholders, while the other creditors had no other resort but the road; that consequently, Equity would say to the bill holder, you shall let go the assets of the corporation, and take your pay out of the stockholders. But this Court repudiated all such ideas of equity; and acting from the highest considerations of public policy, recognized and enforced the paramount lien of the bill holder guaranteed by the Statute.

I am fully persuaded, that of all classes of bank debts, that which is most entitled to legislative care against discredit and loss, is the common currency—the circulating medium; and that in addition to the personal liability clauses which have been inserted, from that of the Darien Bank, in 1818, down to the present time, there should be superadded priority of payment out of the assets, in case of insolvency. Indeed, whether constitutional or otherwise, it would be premature to decide, but by the 3d section of the Act of 1842, passed for the purpose of winding up the affairs of the insolvent banks of the State, it is expressly provided, that the *issues* of these banks shall first be paid off and redeemed. (*Cobb's Digest*, 118.)

And yet, in the face of all this, the State has been repeatedly rebuked by legislative reports and resolutions, for allowing the debtors of the Darien Bank to pay their notes in the bills of that bank. And it is suggested as a reason, in one of these papers, why the expenses incurred by the Central Bank for its agency in settling up the business of the Darien

Bank, should not "be charged, by the State, against the creditors!" (*Senate's Journals*, 1847, *p.* 341.)

In the preamble to the Act of 22d Feb. 1850, (*Pamphlet*, 59,) it is said that many of these claims are believed to be illegal and unjust. And the director of the Central Bank was required to make inquiry concerning them; and ascertain and report to the next Legislature thereafter, upon what terms they could be compounded. We see no evidence to show that any of these claims are unjust. But we do see proofs multiplied from year to year, upon the journals of the Legislature, that the most vague and erroneous opinions have been entertained and promulgated as to the true character of the State's liability, growing out of her connection with the Bank of Darien.

In the biennial message of Governor Crawford, submitted to the General Assembly at the beginning of the session of 1845, it is stated that "the liability of the State, as a stockholder, for her proportion of the outstanding circulation of the bank, is unquestionable." Of course it is. His Excellency proceeds—"The estimated amount of this liability may not exceed sixty thousand dollars after the available assets of the bank are realized." A pledge was given, that it should be the policy of the Executive Department to effect the collection of the debts due the bank with convenient despatch, unless otherwise directed. (*Jour. of the House, pp.* 18, 19.)

In response to this message, a joint resolution was passed that session, requesting the Governor to have all the available assets of the bank collected with convenient despatch, and that he cause the same, as well as the lands, to be converted into cash so soon as, in his opinion, it could be done without manifest loss to the State, and so soon as a compliance, with good faith to the *bill holders*, shall demand; and that the proceeds be applied to the redemption of the bills of said bank, and the payment of its other legal liabilities. (*Pamphlet Laws*, 1845, *p.* 201.)

So far, all is good sense—evincing that both Departments of the Government entertained clear and correct views as to

the liability of the State as a stockholder, as well as of her duty as trustee.

In his next biennial Message, the Governor makes but slight allusion to this subject. He refers to the two suits against Anderson—the one as late cashier of the Branch of the Darien Bank at Milledgeville; and the other, as *book-keeper* of the Central Bank—and suggests, that whatever sums may be finally recovered by the action pending *in Greene County*, will be a part of the resources of the Darien Bank, and distributable among its creditors; and that the amount so recovered and paid, will, to that extent, diminish the liability of the State as a stockholder. " Of this liability," says his Excellency, " I have spoken, by my Message to the last Legislature. The opinion then expressed is unchanged." What was the liability of the State, spoken of by Governor Crawford to the last preceding Legislature? It was, that she was bound, only as a stockholder, for her proportion (one half) of "the outstanding circulation of the bank;" that the estimated amount might not exceed $60.000. And he now says, that the opinions then expressed remain unchanged; that is, both as to the nature and extent of the State's liability.

I have felt it to be my duty to be thus minute in quoting from these two messages of one of Georgia's ablest and most vigilant Chief Magistrates, because they were evidently misapprehended by the Legislature of 1847. In the report and resolutions of the committee on banks which was adopted that year, it is said, that "in the *Annual*(?) Messages of his Excellency, Gov. Crawford, in 1845 and 1847, and in the report of the committee on finance, which was assented to on the 27th of December, 1845, the liability of the State of Georgia to pay the bill holders *and creditors*, in proportion to the amount of stock held by the State in the Bank of Darien, is distinctly admitted and shown."

With the utmost deference for the committee which made this report, and the Assembly which adopted it, I respectfully submit, that injustice is done to Governor Crawford by this

statement. He did distinctly concede the liability of the State, as a stockholder, to pay the bill holders. But he never did admit that she was liable, in that character, to any other class of creditors.

What admission may have been made by the committee on finance, in their report to the House of Representatives, we know not, having searched in vain for this document. It is not in the Pamphlet Acts of 1845—neither is it to be found in the Journal of the House. We regret to find that the Journals of the Legislature are lamentably deficient in the registration of matter vitally important to the public interest. The reports of committees, whether select or standing, are rarely preserved. If accompanied with a resolution, the latter is published in the Acts, and the report omitted. Such was probably the fate of this finance report. We do not intend, by these remarks, to censure the Secretary and Clerk and their recording corps. We understand the practice originates in a principle of economy, to-wit: the protection of the State from the publication of unnecessary matter.

We do find, however, a report made that year, by the committee on Banks, in which they state, amongst other things, that they " concur with his Excellency, the Governor, that the State is liable for her proportion of the *outstanding circulation* of the Bank of Darien," but nothing farther. (*Journal of the Senate,* 1845, *p.* 172.) It is hardly to be presumed that a report differing from this, should have been made and approved during the same Session. The committee continues, " The State is *likely* to lose a large sum on account of the Bank of Darien"—much larger than this honorable committee appear to have apprehended. She had *already sunk* $325.000, by way of instalments on her capital stock; she had then in the Treasury $54.170 or 180, as the case may be, of the bills of the bank redeemed in the way of payment of taxes—an item wholly overlooked, so far as we can understand, in considering the liability of the State, from 1842 down to the present discussion. For, strange to tell, I am assured by Counsel, that in the adjustment of the State's liability, both before the

commissioners and the Circuit Court, this pregnant fact has never been brought out and relied upon. The decision of Judge HARDEMAN, making the State responsible for the whole amount of the remaining outstanding circulation, cannot be comprehended upon any other hypothesis. We do not hold it right upon that.

But the loss of the State stops not here. She gets not a dollar of her debt of $25.897 96—a debt which, by the laws of all countries, should be first paid out of the assets; and only asks, in consideration of waving this preferred claim, she may not be forced to account for the $12.723, received on the Anderson judgment in Darien Bank bills, which did not benefit her a cent, as she was not bound to redeem these bills; or at least, but a small portion of them, and is already importuned to refund the amount to the debtors, as having been illegally recovered and paid.

The committee were over-modest in *hinting* that the State was "*likely* to lose" a large sum. Computing the loss of stock, dividends, the amount expended in the redemption of bills, *et cetera*, and $500.000, the subscription price of her 5.000 shares of stock, would scarcely indemnify the State for the damage she has already sustained by this ill-starred enterprize. But the committee proceed.

"As a *stockholder*, the State is, beyond *all doubt*, in the minds of your committee, bound to pay to all *bona fide* bill holders *and creditors*, in proportion to the stock held by the State. Certain judgments have been obtained on the bank bills of the Bank of Darien, and on protested checks given by the Bank of Darien, to take up the bills of said bank. Your committee cannot perceive the difference between such judgments; they equally affect the State, and demand settlement by the State of Georgia, upon the same terms." It was again recommended to appoint a commissioner to report to the ensuing Legislature the names and classes of all creditors; and what "sum per centum" they were ready and willing to receive on final settlement. And by resolution, the

director of the Central Bank was instructed to perform this duty.

We do not feel it to be incumbent upon us to point out the difference between bank bills and checks given by the bank to redeem its bills. The one constituting the circulating medium of the country, cannot be created without special legislative license, and is limited in amount; whereas, against buying and selling bills of exchange, drafts, checks, receiving money on deposit, &c. there is no legal prohibition. Suffice it to say, that for the one class of debts, it has become the universal custom of the Legislature to exact extraordinary security—while for checks, &c. no such security is provided. But we are not here to discuss what the law ought to be, but to decide what it is. Had the *Legislature* adopted the report in the form in which it was originally presented by Mr. Snider, imputing to the State mismanagement in collecting the assets of the Bank of Darien, and asserting, that as *trustee*, she was, beyond all doubt, bound to pay all *bona fide* bill holders *and creditors* one half of their debts, we could have comprehended, to say the least of it, the position intended to be occupied, whether maintainable or not. But when it is gravely put forth, in a paper like this, that the State, as a *stockholder*, is thus liable under the charter, we confess that we are utterly unable to understand what is meant. Suppose there be no difference on the score of abstract justice, between debts due on bank bills and debts due on protested bank checks—(and I do not insist that there is)—still, if the Act of incorporation makes the State, as a stockholder, liable for the bills and not for the checks, does that constitute no difference?

It is to be regretted that such doctrines should emanate from such high places. It is calculated to produce confusion in the public mind—even in the professional and judicial mind; and to create doubt and uncertainty as to doctrines that are as old as the history of corporations themselves. And that is not all: it has excited delusive hopes and expect-

ations in the minds of the creditors themselves, destined of course, to inevitable and vexatious disappointment in the end.

Had I the power, as I have said before elsewhere, I would make the law what it is erroneously supposed to be in this report, in all cases.   Where the joint or corporate assets were exhausted, leaving *any debt whatever* unsatisfied, in accordance with the decision of the House of Lords, in *Dr. Salmon's case, (Chancery Cases*, 206–7.   23 *Charles II. Viner's Abr. Vol.* 6, *p.* 310–11,) every person of the corporation should be held liable to pay his proportion.   That upon failure of corporate assets, in whole or in part, each individual member should be held liable to pay his quota or proportion of the deficiency, is a doctrine, we think, pregnant with the purest equity.   Such, however, was not the law of corporations in 1818, when this bank was chartered.   It is not so now; although our legislation is rapidly approximating to that point.

These are the grounds upon which the creditors propose to make the State liable for having mismanaged and misapplied the assets of the Darien Bank.   After a careful examination of them, we are of the opinion that they have failed to make out such a case as will entitle them to indemnification.

The right of the creditors to the rents which accrued on the real estate, during the period the lands were controlled by the Central Bank, would seem to us to be indisputable, upon the plainest principles of justice.   And that interest should be paid on the proceeds of the real estate sold in Georgia, and upon the annual rents, from the times when those sums were respectively received, would seem to follow as a necessary consequence.   We are not furnished with the data which would enable us to compute the interest.   All we can do, is to settle the rule, leaving the details to be adjusted by the parties themselves.

As we concur with Judge Hardeman upon this branch of the case, and the judgment which he rendered, as stated by Counsel, was, by agreement, so far as the facts are concerned, we would suggest the propriety of making it the basis of set-

tlement, as to the question of rents, unless some mistake or inaccuracy of statement has since been detected. We prescribe nothing authoritative upon this subject.

[12.] After having made common cause against the State, up to this stage of the proceeding, a cross-fire now commences between the allies themselves. The judgment creditors claim to be entitled to the whole of the available assets. The others contend for equality of right and rateable distribution.

So far as the real estate in Georgia is concerned, there can be no doubt. The judgment liens attached upon these lands in 1841, when the repealing Act was passed, and could not be divested.

[13.] Without going into an elaborate examination of this doctrine, we understand the law to be briefly this : That notwithstanding it is a favorite policy of a Court of Chancery to distribute assets equally among creditors *pari passu,* yet,. whenever a judicial preference has been established, that preference is always preserved in the distribution of assets, even in that Court. (*Thompson vs. Brown and others,* 4 *Johns. Ch. Rep.* 619, *and the authorities cited in that case. McDermutt vs. Strong, Ib.* 687.) Whether the creditors are not all equal, as to *equitable* assets, there is a conflict of authority. In a note to *Brown vs. Brown,* (15 *Eng. Ch. R.* 275,) it is stated, that after some struggles in the Courts of Equity, upon this point, it is at length settled, that as to *equitable assets,* the creditors are all equal and are to share in proportion. Yet as to *legal assets,* it has always been held, that *execution creditors* are entitled to priority and preference.

[14.] All the available means of the Darien Bank were. *legal assets.* By which, we mean such assets as may be reached by legal remedy or process, in contradistinction from the equitable interests of a debtor, which the judgment creditor must go into Equity to obtain. True, the lands in Mississippi, the only thing about which there could be any controversy, were not accessible by any legal proceeding in this State.

Robinson *et al. vs.* The Bank of Darien, &c.

But so soon as they were converted into cash, by sale, the agent who held the proceeds, was subject to garnishment at the instance of the judgment creditors.

We are happy, therefore, in being able to ratify, upon legal principles, abundantly fortified by authority, the uniform course of the State in directing the whole of the available assets of the Darien Bank to be paid out to the oldest judgment creditors as fast as they come to hand.

Three points remain to be considered, before concluding this opinion:

[15.] 1st. Is the State liable for the whole or any part of the outstanding circulation? It amounts to $47.342. As early as 1842, the State had redeemed $54.180 of the bills of the Darien Bank, which, added to the $47.342 yet outstanding, would make an aggregate of $101.522, for the one half of which, amounting to $50.761, the State, as a joint and co-equal stockholder, was responsible. But she has taken up $54.180; and consequently, over paid her share by $3.419. Add to this the $12.723 received on the Anderson judgment in Darien bills, and for which she is hereby made to account to the creditors in current funds, by relinquishing a debt of $25.897 96, which was entitled to priority of payment out of the assets of the Darien Bank, and the State will have overpaid her half by $16.142. Is she, in Law or Equity, under obligation to respond further to the bill holders?' Having fully expressed my views upon this point in the case of *Lane vs. Harris,* (16 *Ga. Rep.* 217,) decided at Decatur, August, 1854, I forbear to enlarge upon this point. Ample authority might be adduced in support of the opinion expressed by the majority of the Court in that case, were it deemed necessary. It is considered no longer an open question, in those States where these personal liability clauses have been the subject-matter of adjudication.

In *Tallmadge and others vs. The Fishkill Iron Company and others,* (4 *Barbour's Supreme Court Reports,* 382,) the Court say—"In either case, such limited personal liability is at an end, when the stockholder or director has paid or been

charged with debts to an equal amount.   He can be required to pay the amount of his liability but once, and whether he pays that amount voluntarily, in the discharge of the debts of the corporation, or whether he is compelled to pay it upon suit brought by the corporation or any of its creditors, having paid it he can set up payment as a defence against any further liability."

That was a suit against the directors for an excess; and the charter gave the corporation a right to institute an action during its continuance; " and in the event of its dissolution, to any of the creditors thereof."   The principle is the same as that involved in this case; and it was so treated and considered by the Court.   Indeed, the case of *stockholders* was referred to, to illustrate the rule of recovery against the *directors.*

[16.] 2nd. Are the stockholders of the Darien Bank liable for the bills held by the administrator of James Holford, deceased?

Upwards of $200.000 of the notes of the Darien Bank, were pledged to the New York Banking Company, for the privilege of drawing upon the company through its president, J. Delafield—stipulating, in writing, that the company should be under no obligation to accept the drafts.   The pledge was evidently made, therefore, without the slightest reciprocal benefit.   This immense sum was thus transferred to this company, without the shadow of a consideration.   And notwithstanding suit was instituted to recover these bills, a large portion of them got into circulation.   It is admitted that James Holford was, in his lifetime, an innocent holder.   And the only point submitted for our judgment is, is the State, as a stockholder, liable for the redemption of these bills?   We think so, most clearly.

A bank note, *though stolen*, becomes the property of him who gives valuable consideration for it, having no notice or knowledge of the robbery.   (1 *Burrow's Rep.* 452, *and cases cited in head note.*)   So that, whether the bills got into circulation " by stupendous folly or stupendous fraud," the inno-

cent holder is entitled to collect the bills of the bank, and secondarily, of the stockholders.

[17.] 3d. Is the Milledgeville Bank entitled to recover, under the facts set out in the record, as to the package of bills upon which judgment had been obtained? We think so, provided suitable indemnity be tendered, not only for all future liability upon the original bills, but also against the past, should it turn out that these bills had already been presented and taken up by the State and burnt. (*Story on Promissory Notes*, §445.   *Waters against the Planter's and State Bank, R. M. Charlton's Rep.* 193.) This last case is directly in point.

Of course the two last points are adjudged in reference and subordination to the previously expressed opinion of the Court, as to the State's general liability as a stockholder. For the bills upon which these judgments are founded, constitute a part of the $47.342, still to be redeemed by the stockholders.

In deciding between the State of Georgia and the creditors of the Bank of Darien, we have endeavored to mete out the same measure of justice to the State that we should have done had the litigation been between private citizens. We have striven to ascertain and fix, with precision, the exact legal and equitable obligation of the State. Whether she may not feel it due to herself to throw off the Statutory shield within which she is panoplied, and answer to the full expectation of these creditors, by redeeming the whole of the outstanding circulation, and discharging at least one half of the other claims, we will not undertake to advise. Upon a question of public policy, morals or magnanimity, the State is abundantly capable of deciding for herself, without the aid of our poor prompting. That the grossest misconception has prevailed, both as to the nature and extent of the State's liability as a stockholder in the Bank of Darien, is palpable and undeniable. In support of this assertion, we need only refer to the fact, that when this subject was last before the Legislature, the liability of the State to *all the bona fide creditors* and claimants was rated *at seventy-seven cents on the dollar!* (*Jour-*

Robinson *et al.* *vs.* The Bank of Darien, &c.

*nal of the House*, 1854, *p.* 498.) And while it may be true,. as again and again charged, that she "mismanaged" and "neglected" the assets of the bank after taking the same "by strong hand," we must say, that sufficient proof has not been submitted to us, to sustain the allegation.

Whatever the State may determine to do, we trust and believe that no stain will dim her escutcheon. While, as a Judge, I am constrained to award the judgment which we have rendered, as a tax-payer, I will cheerfully contribute my quota or proportion of any levy which the State may see fit, *voluntarily* to impose, to relieve her character for good faith, from all injurious aspersions, whether well or ill founded.

In view, then, of all the facts embraced in the seven cases between the State of Georgia and the creditors of the Darien Bank, and submitted together for the consideration of the Court—and with the distinct admission, on the part of the Counsel in behalf of the State, that the creditors are entitled to interest on the balance to be awarded to them, at least from the date of the award made by the commissioners—

It is considered and adjudged unanimously, by the Court, 1st. That no liability attaches to the State, either on account of the unpaid stock as originally subscribed, or the thirty-five hundred and sixty-seven shares subsequently transferred to the bank. 2ndly. That as trustee through the Central Bank, for winding up the affairs of the Darien Bank, the State is chargeable with available assets amounting, in the aggregate, to $241.626.52, which is to be diminished by the following credits, to wit:

| | | |
|---|---:|---:|
| Expenses, | $16.309 | 01 |
| Pd. judg. in favor of Jno. G. Winter, | 14.483 | 60 |
| Pd. to judgments in favor of Planters' and State Banks, | 19.179 | 18 |
| Darien Bank bills received as sets off against debts due the bank, | 165.246 | 00 |
| | | |
| Making, | $215.217 | 79 |

which subtracted, leaves balance due by the State, $26.408.79, with interest thereon from the date of the award made by the commissioners.   For this balance, together with interest on the proceeds of the real estate sold in Georgia, and on the annual rents accruing thereon, from the times these sums were severally received, (the principal sums having been already accounted for,) the State is responsible ; and it is adjudged that the same be paid to the Planter's Bank and the Bank of the State of. Georgia, the oldest outstanding judgment creditors of the Bank of Darien, or their Attorney, on account of their judgments, rateably to be divided.   3rdly. As to the outstanding bills, amounting to $47.342, a majority of the Court, (Judge BENNING dissenting,) consider that inasmuch as the State has redeemed already, with the public funds, more than one half of the circulation, the State is discharged from further liability to the bill-holders.   (In the opinion of Judge BENNING, the State is still liable for one half of each unredeemed bill.)

In the case of the State against the administrator of James Holford, deceased, this Court is of the opinion, and so determines, that the stockholders of the Bank of Darien, are liable, under all the facts of the case, for the redemption of the bills held by the intestate of the defendant in error.   And also for the redemption of the bills which were sued on by the Bank of Milledgeville, provided suitable indemnity be tendered, not only that these bills will not again be offered for payment, but also that they have not been already taken up. This portion of the judgment, subject, of course, to be controlled by the opinion already expressed as to the respective liability of the State and the individual stockholders, for the outstanding circulation.

Finally, it is considered and adjudged, that the costs be paid in the said cases, as follows, namely, in Nos. 1 and 9, by the plaintiffs in error ; and in Nos. 7, 10, 11, 12 and 13, by the defendants in error.

STARNES, J.—concurring.

There is one point of this case, in relation to which a difference of opinion exists among the members of this Court, and that is, as to the nature of the State's liability as a stockholder in the Bank of Darien, for the ultimate redemption of the bills.    As we are required, by law, in the event of such a difference, to express our opinions severally, I proceed to say: That according to the view which I take of this subject, the State, as a stockholder, owning one half the capital stock, was liable to redeem one half of all the bills issued.    But according to the facts before us, more than one half of the circulation has been already fairly and legally redeemed and taken up by the State.    Upon the State, therefore, in my opinion, no further liability or obligation rests, by virtue of the provisions of this charter, to redeem any of the circulation still outstanding.

By this charter, and by becoming a stockholder, the State was made liable for the ultimate redemption of the bills or notes of said bank, in proportion to the amount of the value of the shares that were held by the State.    (See *Sec.* 13, *Act of Incorporation, Prince's Dig.* 217.)

This was a liability to redeem a portion of the whole circulation, in proportion to the number and value of the shares held by the State, and not a liability to redeem a portion of each bill with reference to this proportion ; and when so much of the whole circulation as was expressed by this proportion was redeemed, the State was discharged.

For the reasons of this opinion, I refer to the decisions delivered by Judge LUMPKIN and myself, in the case already cited by my brother LUMPKIN, of *Lane vs. Harris,* (16 *Geo. Rep.* 217.)

BENNING, J.—dissenting.

On one of the points common to most of these cases, I dissent from the judgment of the Court. That point is as to the nature and extent of the liability of the State, as a stockholder, to the bill holders.

The part of the charter which governs as to the point, is as follows:

" Sec. XIII. The persons and property of stockholders in said bank, shall be pledged and bound in proportion to the amount of the value of shares that each individual or company may subscribe for or hold in said bank, for the ultimate redemption of the bills or notes issued by and from said bank, in the same manner as in common commercial cases or simple actions of debt; and that the State be pledged for the ultimate redemption of the bills or notes of said bank, in proportion to the amount of the value of shares that shall or may be subscribed for and held by said State."

The meaning of this section of the charter, in the opinion of a majority of the Court, is, that each stockholder is liable for the ultimate redemption of such a part of the bills to be ultimately redeemed, as shall bear to all the bills to be so redeemed, the same proportion which the value of his stock shall bear to the value of the stock of all the stockholders; and consequently, that in redeeming his part of the bills to be redeemed, any stockholder may, at his option, select for redemption the bills held by any one bill holder in preference to those held by any other.

Now this, I think, is, in part, the meaning of the section, and, in part, not. So much of it as indicates what of each stockholder's property is the quantity bound for the redemption of bills, is, I think, a part of the true meaning. So much of it as would make it lawful for that quantity of each stockholder's property to be applied to the redemption of some bills in preference to the redemption of others, is, I think, no part of the true meaning.

The meaning of the section, in my opinion, is this:

The persons and *property* of any stockholder, are *pledged and bound* for the ultimate redemption of such a part of *any* bill as shall bear to the whole of that bill, the same proportion which the value of that stockholder's stock bears to the value of the whole stock. In my opinion, the meaning is such, that every bill holder has for *every bill* held by him, the person "*and property*" of every stockholder, to this extent, "*pledged and bound.*"

This is the opinion which I held in a case lately decided by this Court, arising under a provision similar to this, but contained in another charter, although in so holding I had also to differ from the majority of the Court. That was the case of *Lane vs. Harris*, (16 *Ga. Rep.* 248.) I must say, that after carefully studying the opinions of the majority of the Court in that case, I am but the more confirmed in my own dissentient opinion.

The objections entertained by the majority of the Court to my notion of what is the true meaning of a provision of the kind under consideration, may I think, be reduced to two: 1. That my notion is practically worthless; and 2. That it is not so accordant with the maxim, *vigilantibus non dormientibus jura subveniant* as is their notion of what is the true meaning of such a provision.

Now as to the first of these objections, suppose it were left to the creditors in these cases to say whether my notion is a practically worthless one or not?

But I cannot admit that it would be practically worthless in *any* case. Say the case is such that there are many small bills to be redeemed, and these in many different hands, and that the number of stockholders is great—what is the result? Only this: each bill holder has to collect each of his bills in small parts from each stockholder. Now is it impracticable to collect a debt because it is small? No. The difficulty of collection from stockholders in such cases, is not in *the rule.* It is in this: they set up *other* defences. But that they may do whatever the rule.

I feel confident, that I may safely say this: that if a stockholder has *no defence* of any sort against a bill, he will always gladly pay his aliquot part of it on *presentation*, knowing, as he will, that if he does not pay it then, he will have to pay it inevitably at the end of a three month's suit in a Justice's Court; and in addition to it, the costs of the suit, which may amount to many times as much as that aliquot part of the bill.

Neither can I admit that the rule which the majority of the Court think the one to be deduced from the charter, is more accordant with the maxim "*vigilantibus*," &c. than is the rule which I think the one to be so deduced. Indeed, it seems to me to be the merest *illusion*, to suppose that the rule of the majority will be at all promotive of the ends of that maxim. For how will that rule work? Take the case above supposed, of a great number of bills, in a great number of hands, pursuing a great number of stockholders. Add to the case, what will probably be true in every real case, viz: that a good part of the stockholders are insolvent. Now, in such a case, how will the rule of the majority work with respect to the "vigilant" creditor—the "swift" bill holder? He is the first to present his bill to a solvent stockholder. He demands payment of all that the face of the bill calls for. The stockholder replies, you demand too much. Half of the stockholders are insolvent. I can buy the bills in any quantity at fifty cents in the dollar, but I won't give that much, for they will be lower still.

The "vigilant" bill holder has to sue the stockholder on the bill. While his suit is in progress, all the other bill holders find time to demand of the stockholder payment of their bills. He tells them the same story he had told the first applicant. They become alarmed. The "vigilant" bill holder is ahead of them with his suit. The stockholder, they know, may at his pleasure, prefer one or more of them to the others. Each bill holder at length opens his eyes to the fact that he is at the mercy of the stockholders. He makes up his mind to take what he can get. Then commences among the bill hold-

Robinson *et al. vs.* The Bank of Darien, &c.

ers, a competition for the grace and favor of the solvent stock-holder. The most needy bill holder offers to take the lowest price for his bills. He is chosen. The rest are rejected. The stockholder takes the bills he has thus redeemed at a few cents in the dollar, and pleads them against the pending suit of the "vigilant" bill holder.. The plea is held good. The suit fails, and the "vigilant" bill holder has the costs to pay.

This is the fate to which the rule of the majority must lead the "vigilant" bill holder—the bill holder "swift" to avail himself of all his legal rights. Am I wrong, then, in saying that the rule, as a promoter of the maxim, "*vigilantibus,*" *&c.* is a mere illusion? Rather, as it seems to me, is the rule a means of putting the bill holders completely in the power of the stockholders.

If, however, the rule were better calculated to promote the ends of the maxim, than is the rule which I consider the true one, still I should be constrained, myself, to adhere to the latter rule; and that for reasons which all, perhaps, fall under two heads: 1. *Equality* is equity. 2. The *words* of a Statute must govern, if they are free from ambiguity.

[1.] The rule which I think the true one, treats all bill holders as equally meritorious. It allows none to be deprived, by the rest, of his proportionate part of the property of the stockholders liable to be applied to the redemption of the bills. And in this, it is in strict harmony with almost all the other parts of the law applicable to cases analogous to this case. In proof of this, I merely refer to what is to be found on the subject in my aforesaid opinion in *Lane vs. Harris.* In short, the rule does homage to the maxim, *equality* is equity.

[2.] But more and better. The rule, as I think, does homage to the *naked language* of the law—to the *plain words* of the charter.

This, as we have seen, is the language of the charter :—"The persons and property of stockholders, shall be pledged and bound," &c. "for the ultimate redemption of the bills or notes issued by and from said bank," &c. Now, "*the bills or*

*notes,"* is an expression that cannot but mean *all* the bills or notes.    That being so then, the *property* of the stockholders is *pledged* and *bound* for the redemption of *all* the bills or notes.    This is what the words plainly say.    How, then, can this property, thus *pledged* and *bound* to the payment of *all* the bills, be diverted from its purpose of securing the payment of all, and applied to the payment of only a part?    I see not how it can be done in the face of these words.    Suppose that all the stockholders had made to all the bill holders a mortgage or some other security, couched in the terms of this charter, could, in that case, any one bill holder, let him exercise what "vigilance" or diligence he might, convert that mortgage wholly to his own use?    Could any one bill holder, by being the first to sue, deprive the other bill holders of their *legal rights* under the mortgage?    Is there any one who will say so?    But in what does that case differ from the real case?    It seems to me, that it does not differ from the real case in any essential particular.

It follows, that in my opinion, the State, as it owns one half of the stock, ought to pay fifty per cent. of each outstanding bill.